# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00273-CV

---

**S. E. and K. D., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY**
**NO. C200139CPS, THE HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellants K.D. (Mother) and S.E. (Father) challenge a final order terminating their respective parental rights to a single child, "Jimmy," aged six years at the time of final judgment.[1]  Mother's rights were terminated under predicates (D) (endangerment), (E) (knowing exposure of child to circumstances resulting in endangerment), and (O) (failure to comply with court-ordered service plan).  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).  She contends the evidence is legally insufficient to support the court's finding that termination is in Jimmy's best interest as required by Texas Family Code subsection 161.001(b)(2).  Father's rights were also terminated under predicates (D), (E), and (O), but Father's court-appointed attorney has filed a motion to withdraw in which he argues that the record reveals only frivolous bases for appeal. *See Anders v. California*, 386 U.S. 738, 744 (1967) (stating that court-appointed counsel who

---

[1]  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

believes appeal is wholly frivolous should file motion to withdraw "accompanied by a brief referring to anything in the record that might arguably support the appeal"); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights). We will deny the motion and affirm the decree of termination with respect to both parents.

## BACKGROUND

According to the affidavit filed with its original petition for protection of a child, the Department opened an investigation into Mother and Father upon referral by law enforcement. On September 25, 2020, the San Angelo Police Department reported that an officer had found Mother and Jimmy asleep in a vehicle parked in front of an apartment complex and then had arrested and jailed Mother for outstanding warrants.[2] The referring officer indicated that Mother had been "living from hotel to hotel" and that Father was living in a halfway house. That officer further stated that Mother conceded a history of marijuana and methamphetamine abuse. After finding no one to pick up Jimmy, the police department called the Department. Although Mother and Father independently identified multiple possible caregivers for Jimmy, the Department ruled out all those individuals after investigation indicated that all had a history of Department involvement, criminal activity, or both. The Department placed Jimmy in a foster home, where he remained through trial.

According to this removal affidavit, additional investigation revealed Mother's fifteen-year history of Department involvement with respect to Jimmy and three siblings. Prior investigations resulted in findings of physical abuse of two siblings and neglectful supervision of

---

[2] The affidavit did not specify the nature of the outstanding warrants.

a third.  One of these children was ultimately adopted by an unrelated party when Mother and Father failed to cooperate with the Department; at the time of Jimmy's removal, the other two children were subject to joint-conservatorship orders with third parties not subjects of this suit. Mother confirmed that the three siblings were "no longer in her care."

Also according to the affidavit, further investigation revealed extensive criminal histories for both Mother and Father, with both histories dating back to at least 1998.  Mother's history includes convictions for misdemeanor theft, misdemeanor failure to identify, state jail felony possession of a controlled substance, state jail felony manufacture and delivery of a controlled substance, "held" charges for driving while intoxicated; and pending charges for misdemeanor possession of a controlled substance.[3]  Father's history includes a similar record of misdemeanor, state jail felony, and felony charges and convictions, with the most recent being a conviction for unlawful possession of a firearm in 2018.

The case was tried to an associate judge over two days in March and April of 2022.  Testifying at trial were Department investigator Brittany Medrano, Department caseworker Kymberlie Malatek, foster mother "Brenda," Mother, Father, Paternal Grandmother; and guardian ad litem Vicki Keck.  Exhibits admitted included the trial court's temporary orders, Mother's and Father's respective family service plans, seven criminal judgments and probation revocations against Mother, and nine criminal judgments and probation revocations against Father.  The associate judge also agreed to take judicial notice of the Department's home study of Paternal Grandmother's household.

---

[3]  It is unclear from this limited record on appeal what the Department meant by describing certain charges as "held."

3

Medrano testified first, primarily corroborating the substance of the removal affidavit. She testified that she received a phone call at or around 4:00 a.m. to respond to a scene where a mother was being detained and where no one could be reached to come to pick up the child. Malatek responded to find the arresting officer with Mother and Jimmy. She recalled that Jimmy was still asleep in the back seat and that the car did not have a child's booster seat. She testified that upon contact, Father stated that he "had concerns" about Mother caring for Jimmy. She also testified that Mother "appeared to be" under the influence of an unknown substance at the time of that encounter. She testified that because no appropriate family or fictive kin could be identified for placement, the Department placed Jimmy with Brenda and her husband.

Malatek testified that Mother was not "currently" testing for drug use at the time of removal or at that time of trial and that Mother had never conceded drug use to her. She further testified that Mother was not working and had not had a "consistent place of residence throughout this case." Malatek testified that Father had tested positive for methamphetamines a year earlier and that he declined testing two months before trial, stating that he was "using" without specifying the substance or substances used. On the subject of visitation, Malatek testified:

> There have been visits that appear very appropriate, with both the child and the mother engaging with one another, laughing, playing various games: board games, phone games, discussing school, talking about some of his interests, about dinosaurs and different things of that nature. She's provided activities like flying a kite. They would go outside, and he would fly the kite.
>
> But there have also been other visits where [Mother] had been reminded to refrain from false promises, discussing the matters in the case. And there was a visit that ended early due to some of this as well, and I believe that was a virtual visit, where [Mother] was reminded to not discuss the matters of the case, and then communication continued to happen. So, the visit was ended . . . .

When asked to clarify what she meant by "false promises," Malatek testified that she was referring to Mother's reassurances that Jimmy would return home "soon." She also testified that Jimmy "miss[ed]" his mother, that Mother and Jimmy became emotional during "a few visits," and that Jimmy was "upset" when Mother would cancel scheduled visitation.

With respect to Father, Malatek testified that to her knowledge he was gainfully employed but did not have stable housing and that most of the persons he would likely stay with had prior Department involvement or criminal history. Her descriptions of visitation between Father and Jimmy echoed her descriptions of Mother's visitation—she testified that they had generally gone well, with both Father and Jimmy engaged, but that she had to repeatedly remind Father not to discuss the case with or make promises to Jimmy. She testified that Father became "angry" when reminded about the bounds of conversation with Jimmy and objected to Jimmy referring to Brenda and her husband as "mom" and "dad."

Malatek concluded by testifying of Mother's and Father's respective histories with law enforcement and the Department. She also explained why the Department ruled out each of the individuals Mother and Father named as possible placements. Speaking of Paternal Grandmother, Malatek testified that the interview and home study revealed multiple "concerns," including concerns regarding her health, her income, her ability to care for Jimmy, and her history of interacting with individuals with criminal records.

Brenda testified that Jimmy had become closely bonded to her family—in particular to her own son that is close in age to Jimmy's—describing Jimmy as "very attached" to their son to the point that Jimmy could not sleep in a room without him. She testified that she and her husband plan to adopt Jimmy if parental rights are terminated. She explained that, because of the pandemic, she could hear several of Jimmy's virtual visits with Mother; Brenda

5

described some of these visitations as "very ugly," with Mother arguing with Department staff or with Brenda herself. She testified that Jimmy was "afraid of" Paternal Grandmother due to what Brenda understood to be an "attempted kidnapping." Finally, she testified that Jimmy had initially shown aggressive tendencies toward some members of her family, but that the issue had resolved through family counseling.

Mother testified that her attempts to establish the stable household required by the Department had been hindered by a recent motorcycle accident, which she said resulted in multiple broken ribs, a fractured clavicle, and a blow to the head. She testified that she was further hindered by her intolerance to summer heat and by difficulties maintaining connectivity when everyone communicates "by phone" and "Zoom everything." Mother testified that she had obtained stable housing via an arrangement with two hotels in San Angelo and that if Jimmy were returned to her, they would live at one of these hotels together. She conceded that she had been living at these hotels "not long." Mother testified that she had multiple sources of income, although it is unclear from the record what those sources were, and that she had an income of $800 to $1200 per month. On cross-examination, she conceded that she had "already quit" one job and had not yet started another. She testified that she had not submitted to regular drug testing during the pendency of the case but that she would soon live "two blocks" from a testing facility and would "get on top of it." Like Brenda, Mother testified that Paternal Grandmother would not be an appropriate placement because Jimmy was still afraid of her due to a "kidnapping incident."

In closing her testimony, Mother stated:

> I am my kid's mom, and I want a chance to be my son's mom . . . . I may not have been doing my best, but I've been dealing with what I had, and I don't feel

6

like I was a bad mom. I just want another six months to prove to everybody that I can do this.

Father testified that he was in a halfway house at the initiation of this case but that he had obtained stable housing shortly thereafter. He maintained that his relationship with Jimmy was "awesome" and that Jimmy should have been placed with him as soon as Father established stable housing following his stay at the halfway house. When asked to comment on his long history of substance abuse, Father responded, "Just because somebody has a past doesn't mean that they can't have a better future." He explained his failure to submit to court-ordered drug testing as a result of COVID and due to his "lack of trust" of the testing process. Father testified that he had a "very strong" support system in place. As an example, he described how his family and friends had helped plan a birthday party for Jimmy during a visitation in December of 2021. Father further testified that reunification of Father and Jimmy would be in Jimmy's best interest because, as Jimmy's father, "that's [his] world right there." He suggested, in the alternative, that Paternal Grandmother would be an appropriate long-term placement.

Paternal Grandmother testified that Jimmy had lived with her for a year and a half during 2018 and 2019 and that she had managed his care during that stay. She denied the allegations of any attempted kidnapping, explaining that she just "picked him up from the daycare" and that Mother came to Paternal Grandmother's home and recovered Jimmy "through a window." Paternal Grandmother conceded that she had no possessory rights in place at the time and that she had not obtained permission from Mother to pick Jimmy up from day care or to have him in her home. She conceded her health issues but testified that she was "better"; she also conceded her criminal history but testified that it had been "15, 20 years ago." Paternal Grandmother denied any alcohol or substance abuse but conceded that Father was living with her

7

and with Jimmy "as a family" when Father was charged with misdemeanor possession of a controlled substance and felony possession of a firearm. She also conceded that a previous live-in boyfriend had sexually assaulted one of her grandchildren. She testified that she had not had a valid driver's license since 2003 and that she had been cited or arrested for driving without a license "three or four" times.

Keck testified that she had served as CASA volunteer throughout Jimmy's case. In her opinion, Jimmy was "thriving" in his placement with Brenda's family and she would have no "confidence" in Paternal Grandmother's household as a placement for Jimmy, as she doubted that Paternal Grandmother could "protect him or provide for him." Keck also expressed concern that Paternal Grandmother planned to rely on family members for financial support.

After trial, the associate judge found that the Department had satisfied its burdens under statutory predicates (D) (endangerment), (E) (knowing exposure of child to circumstances resulting in endangerment), and (O) (failure to comply with court-ordered service plan). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E) (O). The associate judge also found that termination of both parents' rights is in Jimmy's best interest. *See id*. § (b)(2). Mother and Father requested de novo trial; the district court adopted the associate judge's findings and ordered terminations under the same statutory predicates. Both parents filed timely appeal.

### DISCUSSION—MOTHER

Mother challenges the legal and factual sufficiency to support the trial court's determination that termination of her rights is in Jimmy's best interest.[4] A trial court may order

---

[4] It is not clear from Mother's brief whether she challenges only the legal sufficiency or both the legal and factual sufficiency of the evidence to support the best-interest finding. As explained herein, on this record, we would reject either challenge.

8

termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental[-]rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship" in absence of "evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007 and *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

9

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard.[5]

---

[5] "Evidence that is factually sufficient to support a finding is necessarily legally sufficient to do so: in conducting legal-sufficiency analysis, the reviewing court employs a standard more favorable to the disputed finding and examines a subset of the evidence that is less likely to controvert that finding." *S.B. v. Texas Dep't of Fam. & Protective Servs*., ___ S.W.3d ____, ____, No. 03-22-00156-CV, 2022 WL 4242538, at *2 n.2 (Tex. App.—Austin Sept. 15, 2022, no pet. h.); *see also, e.g.*, *K.D. v. Texas Dep't of Fam. & Protective Servs*., No. 03-20-00116-CV, 2020 WL 4462320, at *4 (Tex. App.—Austin July 15, 2020, pet. denied) (mem. op.) ("Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard."); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.) ("If the evidence is factually sufficient, then it is necessarily legally sufficient as well."); *In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.) ("[B]ecause the evidence is factually sufficient, it is necessarily legally sufficient." (citing *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.))).

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to [a] minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

In evaluating best interest, we consider the factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which include the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *See A.C.*, 560 S.W.3d at 631; *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.). It is the burden of the party seeking

11

termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive, and no one factor is necessarily dispositive of the question; but in some instances, evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We begin with Jimmy's wishes. Malatek testified that Jimmy missed his mother and enjoyed visitation with her. She later testified that he was bonded to both Mother and Father. Mother testified that she wanted a chance to maintain her relationship with Jimmy. But "while bonding is some evidence of a child's wishes, it is not alone determinative of the question." *C.C. v. Texas Dep't of Fam. & Protective Servs.*, ___ S.W.3d ___, ___, No. 03-21-00617-CV, 2022 WL 1611952, at *9 (Tex. App.—Austin May 20, 2022, no pet.); *see also In re M.A.M.S.*, No. 02-13-00168-CV, 2013 WL 5658253, at *8 (Tex. App.—Fort Worth Oct. 17, 2013, pet. denied) (mem. op.) (terminating notwithstanding that "mother and her children loved each other and had a strong bond"); *E.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00325-CV, 2011 WL 6938496, at *3 (Tex. App.—Austin Dec. 30, 2011, no pet.) (mem. op.) (explaining that courts may "consider their bond" as some evidence of child's wishes). Moreover, Brenda testified that Jimmy had become closely bonded to her entire family, including Brenda, her husband, and their other children, and that he would refer to these foster family members as "mom," "dad," "sister," and "brother."

Turning to Jimmy's emotional and physical needs and any emotional or physical risks now and in the future, the Department's status reports indicate that Jimmy was clean and in generally good health at the time of removal. However, it is well settled that stability and permanence are the paramount considerations in evaluating the needs of a child. *See In re J.D.*,

436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Rios v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00565-CV, 2012 WL 2989237, at *9 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.). In this case, Mother could not identify with any specificity a plan for a stable home with adequate income. She testified that she had arranged to stay at one or more hotels as a source of long-term housing but never described that arrangement and testified that she has only been staying at one of the hotels a short time. She offered vague testimony that she would have adequate income to support Jimmy but also testified that she had quit one job and had yet to start another. Perhaps most importantly, the courts recognize that criminal activity and a history of substance abuse subject a child to instability by "expos[ing] the child to the possibility that the parent may be impaired or imprisoned." *D.H. v. Texas Dep't of Fam. & Protective Servs.*, ___ S.W.3d ___, ___, No. 03-21-00255-CV, 2021 WL 5098308, at *3 (Tex. App.—Austin Nov. 3, 2021, no pet.) (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). There is an undisputed history of criminal activity and chronic substance abuse here.

With respect to the parenting abilities of any parties and evidence of any improper parent-child relationship, a history of Department involvement with the family and evidence of neglect of other siblings is some evidence of poor parenting ability. *See C.H.*, 89 S.W.3d at 27 (holding relevant parent's history of child neglect); *In re E.A.F.*, 424 S.W.3d 742, 751 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A parent's past behavior is indicative of the quality of future care that the parent is capable of providing."); *Walker v. Texas Dep't of Fam. & Protective, Servs.*, 312 S.W.3d 608, 619–20 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (considering past CPS involvement as evidence of lack of parenting abilities). Here, Mother has an extensive history of Department involvement in her household: she testified that Jimmy's three siblings were "no longer" in her care due to the outcomes of their respective cases. The

Department's reports to the court indicate that the Department had made a finding of neglect with respect to two of Jimmy's siblings and a finding of abuse with respect to a third. In addition, Mother's acquiescence to Father's history of criminal activity and substance abuse is indicative of an improper relationship. *See D.F. v. Texas Dep't of Fam. & Protective Servs.*, 393 S.W.3d 821, 836 (Tex. App.—El Paso 2012, no pet.). Meanwhile, multiple witnesses testified that Jimmy's foster parents are raising three children of their own and have sought out assistance in addressing Jimmy's educational, psychological, and physical needs. Brenda testified that, through the help of family therapy, Jimmy's aggressive tendencies had subsided.

When it comes to plans for Jimmy, Mother testified that she would start a job, make enough to support Jimmy, find stable housing, arrange for transportation, and would start regular drug testing. But she offered little testimony regarding how she hoped to accomplish this, and self-serving testimony of such a "speculative" and "hypothetical" nature does not constitute evidence of a concrete plan for a child. *See, e.g.*, *In re A.P.S.*, No. 07-11-00476-CV, 2012 WL 1835688, at *7 (Tex. App.—Amarillo May 21, 2012, no pet.) (mem. op.); *Gonzalez v. Texas Dep't of Fam. & Protective Servs.*, No. 03-06-00004-CV, 2008 WL 2309208, at *6, *9 (Tex. App.—Austin June 5, 2008, no pet.) (mem. op.). Mother offered no testimony or other evidence of how she planned to accommodate Jimmy's need for schooling or any additional psycho-emotional therapy. Meanwhile, both Malatek and Brenda testified that Jimmy was "thriving" in the care of the foster family, that they had placed him in age-appropriate activities, that they were addressing his needs for psycho-emotional care, and that they hoped to adopt him upon termination of parental rights.

Finally, we consider any excuses for the subject parent's conduct. Mother testified that injuries sustained in a recent motorcycle accident and a lack of transportation made

14

it difficult for her to meet the Department's goals for her during these proceedings. However, she offered no explanation or excuse for her twenty-year history of substance abuse, criminal activity, and chronic instability. And even assuming Mother accurately described her recent circumstances, the factfinder was free to conclude that those limitations did not excuse Mother's long-term history of instability and poor parenting. *See, e.g.*, *In re H.R.*, 87 S.W.3d 691, 701 (Tex. App.—San Antonio 2002, no pet.) (holding evidence sufficient to sustain rejection of proffered excuses where parent failed to take responsibility for conduct).

After reviewing the record, we conclude the evidence would allow a reasonable factfinder to come to a firm belief or conviction that termination of Mother's parental rights is in Jimmy's best interest. The evidence is therefore both legally and factually sufficient to support the best-interest finding, and we reject Mother's sufficiency challenge to that finding.

### DISCUSSION—FATHER

Father's court-appointed attorney has filed a motion to withdraw accompanied by a brief concluding that any appeal is frivolous and without merit. *See Anders*, 386 U.S. at 744; *P.M.*, 520 S.W.3d at 27 & n.10. Counsel's brief meets the requirements of *Anders* by presenting a professional evaluation of the record demonstrating that there are no arguable grounds for reversal to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied) (applying *Anders* procedure in parental-rights termination case). He has also certified to this Court that he provided Father with a copy of the *Anders* brief and motion to withdraw as counsel and a notice of his right to file a pro se brief. Father did not file a brief.

Upon receipt of an *Anders* brief, we must conduct a full examination of the proceedings to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80 (1988). After reviewing the record and the briefing, we find nothing that would arguably support a meritorious appeal. We thus agree with counsel that this appeal is frivolous and without merit.

We nevertheless deny counsel's motion to withdraw. In *P.M.*, the Supreme Court of Texas explained that a parent's right to counsel in termination suits extends to "all proceedings in [the Supreme Court of Texas], including the filing of a petition for review." *See* 520 S.W.3d at 27. Accordingly, counsel's obligation to Father. has not yet been discharged. *See id.* If Father, after consulting with counsel, desires to file a petition for review, counsel should timely file with the high court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27–28.

## CONCLUSION

For the reasons stated herein, we affirm the order of termination.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: October 28, 2022